ORDERED.

Dated: April 30, 2012



Eileen W. Hollowell, Bankruptcy Judge
_____

# IN THE UNITED STATES BANKRUPTCY COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re: | Chapter 11 |
| West Speedway Phase II, LLC, | Case No. 4:09-bk-15664-EWH |
| Debtor. | **AMENDED \* MEMORANDUM DECISION REGARDING NATURAL GAS IMPROVEMENT** |

## I. INTRODUCTION

There are beautiful saguaro studded hills on the west side of Tucson. That is where the Enclaves at Gates Pass is located–a subdivision ("Subdivision") where development was to occur in two phases. Phase I ("Phase I") was developed first and consisted of approximately 21 custom home lots. Most of those lots were sold between 2004 and 2006, despite the fact that the Subdivision's improvements were incomplete–making it impossible for the purchasers of the lots ("Lot Owners") to build their houses. Since 2006, there have been two different bankruptcies involving the Subdivision. In 2008, the first developer, West Speedway Partners ("WSI"), as part of its Chapter 11 plan of reorganization,

___
\* An Amended Memorandum is being issued to correct numerous typographical errors in the original. The substance of the decision remains unchanged.

transferred the unsold portions of the Subdivision ("Real Property") to West Speedway Partners II ("WSII"). In 2009, after WSII's expected financing collapsed, it too filed for Chapter 11. Since then, litigation has been filed and dismissed in multiple courts. Deadlines for subdivision reports, various settlement agreements, and bankruptcy court orders have come and gone. The performance bond ("Bond") issued to assure completion of improvements in Phase I has been called by Pima County ("County") and, pursuant to a 2010 settlement agreement ("Settlement Agreement"), released to WSII to be used exclusively to complete improvements in Phase I. But regulatory approvals and disputes among the parties have led to one delay after another. Former allies have become adversaries. Multiple mediations have been held. Conflict continues. This memorandum addresses one discrete issue: whether WSII must supply natural gas to all of the lots in Phase I, including lots owned by the Lot Owners ("Lot Owners' Lots"). Perhaps this Court's decision, that WSI's obligation to supply natural gas is solely contractual and does not include the Lot Owners' Lots, will bring closure and permit the parties to move forward. Theoretically, anything can happen. For example, one day pigs may learn how to fly.

## II. **JURISDICTION**

All parties to this dispute, other than WSI, have consented in writing to this Court's jurisdiction. While WSI did not file a consent to jurisdiction, it did file a brief arguing that WSII is required to provide natural gas to all of Phase I, including the Lot Owners' Lots. In earlier pleadings, WSI asserted that because the Settlement Agreement includes a mandatory arbitration clause with a named arbitrator, this Court lacks jurisdiction to decide any matter addressed in the Settlement Agreement.

2

However, the Lot Owners, one of the parties seeking relief before this Court, are not parties to the Settlement Agreement, and, therefore, the mandatory arbitration provisions of that agreement do not apply to them.

Furthermore, much of the analysis regarding whether natural gas must be provided, and to whom, depends on the interpretation of the contract ("Contract") for the sale of the Real Property from WSI to WSII. The Contract was approved as part of the confirmation of WSI's Chapter 11 plan. Under Article VII(c) of that plan, this Court retains jurisdiction over the plan's implementation. Accordingly, jurisdiction over WSI is proper under the terms of its confirmed plan and over all other parties by consent.

## III. **THE POSITION OF THE PARTIES**

A.  WSII

The WSII brief attaches numerous documents to support its argument that:

(1)  no government agency (federal, state, county or city) requires installation of natural gas;

(2)  no plans or plats require installation of natural gas;

(3)  contracts, permits, and "Property Documents," which were purportedly assigned from WSI to WSII under the Contract, either expired before the March 6, 2008 purchase date ("Purchase Date") and/or the contracts, permits, and Property Documents were never delivered from WSI to WSII. Included in the "never received" category is any contract or plans with Southwest Gas;

(4)  a 2004 Subdivision Public Report ("Public Report") issued by the Arizona Department of Real Estate, which lists Southwest Gas as a utility provider,

3

was suspended in 2006 and, therefore, is not binding on WSII because WSII did not take title to the Real Property until 2008;

(5) WSII was only assigned purchase agreements ("Assigned Purchase Agreements") for two lots in Phase I, which were in escrow on the Purchase Date;

(6) misrepresentations were made by WSI to WSII regarding the location of a main gas line;

(7) the Assigned Purchase Agreements only refer to "gas," not "natural gas";

(8) the Initial Assurance Agreement (January 7, 2004) and Substitute Assurance Agreements (December 2, 2004) issued with respect to Phase I limits improvements to what is called for in the Subdivision plat, which does not require natural gas;

(9) a Release of the Subdivision Assurance Trust (December 14, 2004), which permitted WSI to substitute the Bond for holding title to the Subdivision in a trust, does not require delivery of natural gas;

(10) the costs of providing natural gas is prohibitive;

(11) there is no loss in value to the Lot Owners' Lots if natural gas is not delivered.

B. <u>The Lot Owners</u>

The Lot Owners argue that WSII is contractually bound by the Settlement Agreement to provide natural gas to all of the lots in Phase I because:

(1) their original purchase agreements with WSI ("Lot Owners' Purchase Agreements") provided for natural gas;

4

(2) the Public Report was part of the Lot Owners' Purchase Agreements and, because the Public Report includes Southwest Gas as one of the utility providers, natural gas must be provided to their lots by WSII;

(3) WSII admitted and/or represented that natural gas was required through statements it made in court and by including natural gas as a line item in budgets or exhibits filed in its bankruptcy case;

(4) "Original Documents" consisting of the Initial Assurance Agreement, Substitute Assurance Agreement, Release of Subdivision Assurance Trust, Final Plat, as well as the Subdivision's Covenants, Conditions & Restrictions ("CC&Rs"), require WSII to deliver natural gas to all of the lots in Phase I;

(5) no proposed alternative by WSII is acceptable to the installation of natural gas .

C. <u>WSI</u>

WSI argues that WSII must provide natural gas to all of the lots in Phase I because:

(1) WSII has made representations in hearings and pleadings indicating that it understood that natural gas was a required improvement for all lots in Phase I;

(2) WSII was on notice that natural gas was required because, after the sale, WSII removed trenches at the Subdivision which included gas lines;

(3) because the CC&Rs prohibit above-ground storage tanks, natural gas must be provided;

5

Case 4:09-bk-15664-SHG    Doc 147    Filed 04/30/12    Entered 04/30/12 16:01:47    Desc
Main Document - Memorandum/Opinion    Page 5 of 16

(4) WSI's principal verbally informed WSII's principal that natural gas was required;

(5) because the Public Report lists Southwest Gas as a utility provider, natural gas must be provided;

(6) WSII has submitted budgets and exhibits in its bankruptcy case which include line items for natural gas;

(7) WSII has misled all parties about what permits it had in order to complete improvements in Phase I;

(8) WSII cannot confirm a plan of reorganization unless there is an infusion of capital by its principal;

(9) WSII, as title holder of the Real Property, should pay any costs associated with delivery of natural gas to all lots in Phase I.

D. <u>Pima County</u>

The County has filed a brief indicating:

(1) the County does not require that a natural gas line be provided to the Subdivision;

(2) approvals for development of the common area of the Subdivision will not require installation of natural gas to Phase I of the Subdivision.

## IV. **ANALYSIS**

In order to decide whether natural gas is required as an improvement and, if so, the scope of that obligation, an analysis must be conducted in four distinct areas:

(1) Do the terms of the Contract and/or the Settlement Agreement require WSII to deliver natural gas to all or any portion of Phase I?

6

(2) Do the agreements assigned to WSII by WSI require WSII to deliver natural gas to all or any portion of Phase I?

(3) Do certain recorded documents, including plats, assurance agreements, CC&Rs, and subdivision reports require WSII to deliver natural gas to all or any portion of Phase I?

(4) Do representations made by WSII and/or other evidence of WSII's understanding regarding supplying natural gas to the Subdivision require WSII to provide natural gas to all or any portion of Phase I?

A. <u>Contract and Settlement Agreement</u>

    1. <u>Contract</u>

The Contract transferred the Real Property to WSII. The Real Property consists of three lots (12, 13, and 18) in Phase I ("Phase I Lots"), together with any common area in the Subdivision and all of Phase II. The purchase price was $2,720,000–$320,000 in cash and $2,400,000 in the form of a promissory note in favor of WSI, secured by the Real Property.

The Contact required WSI to assign all of its interest in licenses, governmental approvals, permits, contracts with utility service providers, all "Property Documents" (surveys, plats, engineering data, etc.), and all trade name and trademarks to WSII (Contract 3.3 and 4.1). WSI was to deliver to WSII an "Assignment of Declarant's Rights" including any rights under any CC&Rs (Contract 7.1.3). WSI was also required to deliver an "Assignment and Assumption Agreement of Purchase Agreements" for each of the Phase I Lots, including known deposits (Contract 9.6).

7

The January 2008 Order confirming WSI's plan of reorganization and approving the Contract provides in subparagraph D that WSII could not close sales on any Phase I Lot until it completed "Phase I Improvements and the County has inspected them and finds them to be in compliance with the plans." WSI's Confirmation Order states that Phase I Improvements are defined by 9.4 of the Contract. Section 9.4 of the Contract defines Phase I Improvements ("Phase I Improvements") as:

> certain improvements and infrastructure for Phase I identified by Pima County.

Section 9.4 further provides that when the Phase I Improvements are completed, they must be approved by the County, "any applicable" utility, and any other governmental authority or agency having jurisdiction over the Real Property.

Because the Contract defines Phase I Improvements as improvements and infrastructure identified by the County, and because the County does not require that natural gas be provided to the Subdivision, the Contract does not require WSII to provide natural gas to any lot in Phase I.

2. <u>Settlement Agreement</u>

The Lot Owners are not parties to the Settlement Agreement. Paragraph 15 of that agreement states that there are no third-party beneficiaries to the Settlement Agreement. Notwithstanding that provision, the Lot Owners assert that the Settlement Agreement requires that natural gas be provided to all lots in Phase I.

The Settlement Agreement permitted the indemnity company to release the penal amount of the Bond ($696,813) to a controlled account to be used exclusively "for construction of the subdivision improvements on Phase I of the Subdivision" (collectively

8

"Subdivision Phase I Improvements") (Section B of December 21, 2009 Letter of Intent incorporated into the Settlement Agreement by paragraph 2 of that agreement).  Similar to the Contract, the Settlement Agreement at Section E prohibits any development of Phase II until the Subdivision Phase I Improvements are complete.

The Settlement Agreement does not specify what improvements are included in Subdivision Phase I Improvements.  Section M is consistent, however, with the Contract's definition of Phase I Improvements.  Section M provides in relevant part:

> Upon final completion of the Subdivision Phase I Improvements *to the satisfaction of Pima County*, and upon payment to Capitol (issuer of the Bond) in the amount of the full extent of its Loss, Capitol will waive, vacate, rescind or assign and all rights it may have in the Collateral.

(emphasis added).

Under Section 9.4 of the Contract, Phase I Improvements are those improvements identified by the County and completed to its satisfaction (and to the satisfaction of any regulatory authority with jurisdiction over the Subdivision and any "applicable" utility provider).  The Settlement Agreement also requires that Subdivision Phase I Improvements be satisfactory to the County.  The County does not require delivery of natural gas to the Subdivision.  Accordingly, if WSII satisfactorily completes the improvements in Phase I identified by the County, it will satisfy its obligations under both the Contract and the Settlement Agreement.

Even if the Lot Owners are third-party beneficiaries of the Settlement Agreement, the result is the same.  In order to satisfy its obligations under the Contract and the Settlement Agreement, WSII must satisfactorily complete the improvements in Phase I which the County requires.

9

B.   Assigned Contracts

While the Contract and the Settlement Agreement do not require that WSII provide natural gas to Phase I of the Subdivision, WSII may still be contractually obligated to provide natural gas by the terms of various contracts assigned to it under the Contract.  The Lot Owners and WSI argue that the Lot Owners' Purchase Agreements and an assignment of a purported contract with Southwest Gas require WSII to provide natural gas to all of the lots in Phase I.

(1)   Southwest Gas Contract

The Lot Owners argue that because WSI and WSII executed an assignment ("Assignment") to WSII of a purported contract between WSI and Southwest Gas, that the Lot Owners, as third-party beneficiaries of the Assignment, may require WSII to deliver natural gas to all of the lots in Phase I.

WSII asserts that no contract between WSI and Southwest Gas exists because WSI never delivered any contract to WSII as required by Sections 3.3 and 4.1 of the Contract.  Notably, no contract between WSI and Southwest Gas has been submitted in the Lot Owners' or WSI's briefs.[1]  Furthermore, Southwest Gas did not file a proof of claim in WSI's bankruptcy case, and WSI's schedules do not list Southwest Gas as a creditor or as a party to an executory contract on Schedule G.  WSII could only assign what it had.  If no contract with Southwest Gas exists, the Assignment is a nullity.

---

[1] WSI has attached to its brief a 2005 addendum to a contract with Parkhurst Construction that refers to a "4" gas trunk main."  That, however, is not a contract between WSI and Southwest Gas.

10

Even if a contract between WSI and Southwest Gas exists, it would not change the Contract's definition of Phase I Improvements or the Settlement Agreement's definition of Subdivision Phase I Improvements. Any assigned contract with Southwest Gas is just that–a contract. Contracts can be breached or, if the contract is executory, rejected by a Chapter 11 debtor.[2] Breach or rejection will give the non-breaching party a right to damages–nothing more.

(2) <u>Purchase Agreements</u>

There are at least two Assigned Purchase Agreements for the Phase I Lots.[3] The Assigned Purchase Agreements list "gas" as an improvement. The Public Report is attached to those agreements which list Southwest Gas as a utility provider. Accordingly, the Assigned Purchase Agreements impose a contractual duty on WSII to provide natural gas, but only as to the Phase I Lots. WSII was not assigned the Lot Owners' Purchase Agreements under the Contract. Any contractual rights the Lot Owners–who are fee owners of their lots–have for breach of the Lot Owners' Purchase Agreements are rights solely against their seller, WSI.[4]

---

[2] Any contract to provide utilities will have performance due on both sides and will, therefore, be executory under 11 U.S.C. § 365.

[3] WSII asserts only two of the three Phase I Lots were subject to a pending sale on the Purchase Date. The analysis is the same, however, whether there were one or three Assigned Purchase Agreements.

[4] The Lot Owners apparently understand that their contract claims are claims against WSI since they filed breach of contract claims in WSI's bankruptcy case. They have not filed such claims in WSII's bankruptcy case.

11

Just as with the purported contract with Southwest Gas, WSII's obligation under the Assigned Purchase Agreements is contractual. Contracts can be breached or, if appropriate, rejected–giving the non-breaching party a right to damages. However, so long as WSII satisfactorily completes the Phase I Improvements identified by the County, any breach under the Assigned Purchase Agreements will not be a breach of the Contract or the Settlement Agreement.

C.  Original Documents

The Lot Owners assert that under the Original Documents, WSI was required to complete improvements, including installing natural gas, and that WSII as the purchaser of the Real Property is also bound by those documents to provide natural gas to all of the lots in Phase I. The Original Documents include: the Public Report, Initial Assurance Agreement, Substitute Assurance Agreement, Release of Subdivision Assurance Trust, Final Plat, and the CC&Rs.

The various assurance agreements have been replaced by the Settlement Agreement, which released the Bond. For the reasons explained earlier, the Settlement Agreement does not require natural gas as an improvement. The parties disagree about whether natural gas is specified as a utility in the Final Plat.[5] The platting process, however, falls within the County's authority. See A.R.S. § 11-822. Since the County has indicated that it will not require natural gas as an improvement to the Subdivision, it is assumed that: (1) there is nothing in the Final Plat which requires

---

[5] The copy submitted to the Court in earlier pleadings is illegible.

12

natural gas; or (2) even if there is, compliance with that part of the Final Plat is not required in order for WSII to obtain the County's approval for the Phase I Improvements.

The Lot Owners and WSI assert that because the CC&Rs bar above-ground tanks, that natural gas must be provided as an improvement. However, the CC&Rs could restrict above-ground tanks even if the Subdivision were "all electric." The CC&Rs ban on above-ground tanks does not prove that natural gas is a required improvement. It just proves that lot owners cannot have above-ground tanks on their lots.

The Lot Owners also assert that WSII, as the successor in interest to WSI, is bound by the terms of the Public Report which requires natural gas as an improvement. This argument fails. WSII did not acquire the entire Subdivision, but only the Real Property which included the Phase I Lots, but not the Lot Owners' Lots. The Public Report, which WSI allowed to lapse, leading to its revocation in 2006, was in effect when the Lot Owners closed the purchases of their lots.[6] When improvements were not completed, the Lot Owners had the right to damages against WSI for breach of the Lot Owners' Purchase Agreements.

It may be that, under Arizona law, WSII is a successor "subdivider" as to the Phase I Lots it acquired from WSI–a question that need not be reached by this Court.[7] The Lot Owners have, however, failed to explain how WSII is a successor "subdivider"

---

[6] It is unclear how those sales were permitted to close since A.R.S. § 32-2183(F) prohibits the sale of subdivided property if the property is out of compliance with its public report.

[7] See Alaface v. Nat'l Inv. Co., 181 Ariz. 586, 592, 892 P.2d 1375, 1381 (1994) (successor in interest to lots within a subdivision is an owner of subdivided lands).

13

for Lot Owners' Lots that it did not acquire from WSI. If there have been violations of the Public Report and/or other provisions of Arizona's subdivision laws with respect to the Lot Owners' Lots, those violations are the responsibility of WSI, not WSII.

D. <u>WSII's Representations and Understandings Regarding Natural Gas</u>

WSI and WSII spend time in their briefs pointing fingers at each other about "misrepresentations" and "understandings." Conversations which occurred prior to the execution of the Contract about whether natural gas was a required improvement are barred by Section 10.9 of the Contract, which provides that the Contract is the entire agreement between the parties and can be amended, modified, or supplemented only in writing. Conversations about the parties' understanding of the definition of Phase I Improvements are, therefore, parole evidence which cannot be considered unless the Contract is ambiguous, and it is not. Similarly, Section 5.2 of the Contract bars WSII from claiming that it should not be bound by the Contract because of alleged misrepresentations by WSI. WSII was provided with a due diligence period. Thereafter, it took title to the Real Property "as is."

Both the Lot Owners and WSI point out that WSII filed exhibits and cost estimates that included natural gas as a line item. Exhibit B to the Contract is WSII's budgeted cost estimates, but that exhibit is not referenced in 9.4 of the Contract where Phase I Improvements are defined. Instead, it is referenced in 2.1.3, which adjusts the amount of the note due from WSII to WSI. WSII also prepared two exhibits that included line items regarding natural gas when it filed a motion seeking approval of the Settlement Agreement. However, neither of those exhibits were attached to or incorporated into the Settlement Agreement. At most, the three exhibits indicate that

14

WSII anticipated providing natural gas to some part of the Subdivision, which is not surprising since natural gas is a required improvement under the Assigned Purchase Agreements. But whatever WSII may have anticipated or understood, it does not change the definitions of Phase I Improvements or Phase I Subdivision Improvements contained in the Contract and the Settlement Agreement.[8]

The balance of the "misrepresentation" arguments, especially those made by WSI, are little more than name calling. The Subdivision has been a mess for years. Finger pointing and outrage do not shine any light on what improvements must be provided to Phase I.

## V. **CONCLUSION**

The Contract defines Phase I Improvements as being the improvements and infrastructure identified by the County. The terms of the Settlement Agreement regarding Subdivision Phase I Improvements are consistent with the Contract's definition of Phase I Improvements. Because the County does not require natural gas as an improvement, WSII has no obligation under the Contract or the Settlement Agreement to provide natural gas as an improvement. It does have a contractual obligation to provide natural gas to lots subject to an Assigned Purchase Agreement, but not to the Lot Owners' Lots. No evidence has been provided that WSI had a contract with Southwest Gas to assign to WSII. Even if such a contract existed, it would not alter the definition of Phase I Improvements.

---

[8] Similarly, WSII's tearing out of trenches at the Subdivision, which included gas lines, does not alter the terms of the Contract and the Settlement Agreement.

15

Both the Lot Owners and WSII ask for an award of attorneys' fees against each other. They each also ask the Court to order the other to comply with their suggested compromise to the "gas problem." Neither side cites any authority that would permit an award of attorneys' fees in their favor, and the Court is aware of none. Accordingly, both requests are denied. Similarly, the Court declines to impose any settlement on the parties. It has been asked to decide a discrete issue and has done so.

WSII's Chapter 11 case has been pending since 2009. WSII must now move forward with its case. A separate order will be entered this date setting a status hearing on WSII's reorganization plan, which should proceed expeditiously to confirmation or, if no reorganization is possible, then WSII 's case must either be converted to Chapter 7 or dismissed.

Signed and dated above.

Notice to be sent through
the Bankruptcy Noticing Center
"BNC" to the following:

Michael W. Baldwin  
Law Offices of Michael Baldwin PLC  
5533 E. Pima Street  
Tucson, AZ 85712-3703  

Dennis J. Clancy  
Raven Clancy & McDonagh PC  
313 S. Convent  
Tucson, AZ 85701  

Walter F. Wood  
1209 N. 4th Ave.  
Tucson, AZ 85705  

Neil J. Konigsberg  
Pima County Attorney's Office  
Civil Division  
32 N. Stone Ave., Suite 2100  
Tucson, AZ 85701  

Adam D. Melton  
Mann, Berens & Wisner LLP  
3300 N. Central Ave., Suite 2400  
Phoenix, AZ 85012  

Christopher J. Pattock  
Office of the U.S. Trustee  
230 N. First Ave. #204  
Phoenix, AZ 85003-1706  

16